# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **NEDRICK JEFFREY HARDY, SR.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 17−cv−1354−NJR |
| | ) | |
| **BRUCE RAUNER,** | ) | |
| **ILLINOIS DEPARTMENT OF** | ) | |
| **CORRECTIONS,** | ) | |
| **JOHN BALDWIN,** | ) | |
| **KIMBERLY BUTLER,** | ) | |
| **LASHBROOK,** | ) | |
| **J. TROST,** | ) | |
| **SIDDIQI,** | ) | |
| **ASSELMEIER,** | ) | |
| **NEWBOLD,** | ) | |
| **RITZ,** | ) | |
| **WEXFORD HEALTH SOURCES, INC.,** | ) | |
| **A. WILLIAMS,** | ) | |
| **AIMEE LANG,** | ) | |
| **STINSON,** | ) | |
| **LOUIS SHICKER,** | ) | |
| **MELVIN HINTON,** | ) | |
| **JOHN DOE 1,** | ) | |
| **JOHN DOE 2, and** | ) | |
| **SALVADOR GODINEZ,** | ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Nedrick Jeffrey Hardy, an inmate of the Illinois Department of Corrections ("IDOC") currently housed at Menard Correctional Center, brings this action seeking damages for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. The complaint requests injunctive relief.

1

This case is now before the Court for a preliminary review of the Complaint pursuant to 28 U.S.C. § 1915A, which provides:

> (a) **Screening** – The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
> (b) **Grounds for Dismissal** – On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint–
> (1) is frivolous, malicious, or fails to state a claim on which relief may be granted; or
> (2) seeks monetary relief from a defendant who is immune from such relief.

The Court's initial review of the 102-page Complaint suggests that parties and claims are improperly joined pursuant to Federal Rule of Civil Procedure 20. Thus, before screening the case on the merits, the Court must apply Federal Rules of Civil Procedure 20 and 21.

In *George v. Smith*, the Seventh Circuit emphasized that unrelated claims against different defendants belong in separate lawsuits, "not only to prevent the sort of morass" produced by multi-claim, multi-defendant suits, "but also to ensure that prisoners pay the required filing fees" under the Prison Litigation Reform Act. 507 F.3d 605, 607 (7th Cir. 2007) (citing 28 U.S.C. § 1915(b)(g)); *Wheeler v. Talbot*, 695 F. App'x 151, 152 (7th Cir. 2017) (failing to sever mis-joined claims prejudices the United States Treasury); *Owens v. Godinez*, 860 F.3d 434, 436 (7th Cir. 2017). A prisoner who files a "buckshot complaint" that includes multiple unrelated claims against different individuals should not be allowed to avoid "risking multiple strikes for what should have been several different lawsuits." *Turley v. Gaetz*, 625 F.3d 1005, 1011 (7th Cir. 2010). The Court has broad discretion as to whether to sever claims pursuant to Federal Rule of Civil Procedure 21 or to dismiss improperly joined defendants. *See*

*Owens v. Hinsely*, 635 F.3d 950, 952 (7th Cir. 2011); *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1016 (7th Cir. 2000).

Federal Rule of Civil Procedure 20 permits joinder of all claims that "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences; [when] any question of law or fact common to all plaintiffs will arise in the action." That means that a plaintiff cannot join separate claims against different defendants or sets of defendants in the same lawsuit, unless he or she sserts a claim for relief against each defendant that arises out of the same transaction or occurrence or series thereof, and presents common questions of law or fact. *Owens*, 860 F.3d at 436; *George*, 507 F.3d at 607.

## **The Complaint**

Plaintiff alleges that Menard is overcrowded and that the State of Illinois knows about the problem. (Doc. 1, pp. 5-6). Plaintiff arrived at Menard in 2014. (Doc. 1, p. 7). As a result of the overcrowding, he has been housed in double-man cells that were designed to house only one inmate. (Doc. 1, p. 19). Plaintiff has been unable to exercise in these cells, causing him to develop arthritis, knee pain, back pain, headaches, and constipation. *Id.* Specifically, Plaintiff was assigned to the North 1 Upper Cell House, the South Uppers, and the South Lowers. (Doc. 1, p. 31).

Plaintiff also was inappropriately placed in a cell with an inmate with a history of violence. (Doc. 1, p. 19). That cellmate threatened Plaintiff's life in front of an unnamed officer, and the officer stated that he would take no action. (Doc. 1, pp. 19-20). Plaintiff wrote a grievance; he was later moved. (Doc. 1, p. 20).

Plaintiff also alleges that he is being denied access to the courts. (Doc. 1, p. 21). Menard only permits inmates to visit the law library one day a week. *Id.* Plaintiff's visits with his

attorneys are non-contact visits, and when his lawyers have documents for him to inspect, a guard must be present. *Id.* On ten different occasions, Plaintiff has made a privileged phone call with his attorney in a space where he could be overheard by others. (Doc. 1, p. 22). Plaintiff also objects to the use of a "runner system" in the segregation units, in which other inmates are used to carry legal documents to the law library. *Id.* He alleges that the system permits inmates to read his privileged legal documents. *Id.* Plaintiff's legal mail has been opened outside of his presence on more than eighty different occasions between 2014 and 2017. *Id.* His legal mail also was held for up to seven days. *Id.*

Plaintiff alleges that he has to wear the same clothes for a year or more, despite having holes in his underwear. (Doc. 1, p. 23).

Menard serves inmates soy products due to budget cuts, which has caused Plaintiff to experience stomach cramps, constipation, straining, and a hernia. *Id.* Plaintiff alleges that he notified defendants about these conditions, and defendants were on notice of the conditions from other lawsuits. (Doc. 1, pp. 23-24).

Plaintiff alleges that the grievance process is insufficient to address problems with staff conduct. (Doc. 1, pp. 24-25). The State of Illinois, IDOC, Rauner, Baldwin, Butler, and Lashbrook are violating their "carceral burden" in ignoring all of the above issues. (Doc. 1, p. 25).

Menard has no ventilation system, and Plaintiff was subjected to extreme heat temperatures when he was housed in segregation and placed behind a steel door. (Doc. 1, p. 26). At an unspecified time, Plaintiff was not given his fan. *Id.* He alleges that Defendants knew that the segregation cells were dangerous because other inmates have died. *Id.* Plaintiff wrote medical

staff and spoke to them face-to-face about his heat sensitivity due to his medications. *Id.* Medical staff told Plaintiff he was not heat sensitive. (Doc. 1, p. 27).

There also was black mold in segregation, and specifically in Plaintiff's cell, for three months. *Id.* Plaintiff developed more than one sinus infection from the black mold. *Id.* There also was black mold in the showers of multiple cell houses. *Id.* The showers in the South Uppers have a sign on the door warning people not to close the door all the way, suggesting that "they" know there is mold in the shower. (Doc. 1, p. 31). Plaintiff caught an upper respiratory infection from this mold, and he had to be taken to an outside hospital for an IV and antibiotics. (Doc. 1, p. 27).

In addition, Plaintiff was placed in a cell with blood and feces on the wall without adequate cleaning supplies. *Id.* He also fell as a result of being assigned to the top bunk, which lacks a ladder, and as a result, he hurt his back. (Doc. 1, p. 27-28).

And, as if that is not enough, Menard has "ping-pong" toilets, which do not adequately flush and thereby harm Plaintiff's health. *Id.* Moreover, the water on the exercise yard is turned off in the winter, and Plaintiff is not able to bring a water bottle out with him, causing him to be without water for three hours, which is bad for his high blood pressure. *Id.*

Defendants do not give Plaintiff the one hour of exercise mandated by the Illinois Administrative Code. *Id.* This causes Plaintiff back pain, headaches, and constipation. *Id.*

Plaintiff goes on to allege that the cell house is infested with vermin. *Id.* As a result of the mice, roach, ants, black flies, and gnat infestation, Plaintiff has lost commissary food. *Id.* The vermin also has gotten in his face and property boxes. *Id.* The kitchen is also specifically infested with pests, including roaches, mice, birds, flies, and gnats. (Doc. 1, p. 29). There are also cracks in the walls. *Id.* And the water in the sinks and showers frequently smells bad; Plaintiff believes the sewer lines are backing up into the sinks and showers. *Id.* As a result, he has itchy skin. *Id.*

The trays upon which meals are served are falling apart and unsanitary. (Doc. 1, p. 30). Plaintiff choked on a piece of plastic once and showed it to a correctional officer, but the officer just laughed. *Id.* Likewise, the cups that the inmates use are not properly cleaned; Plaintiff believes he once got diarrhea from drinking out of the cups. *Id.*

In the winter, the heating system does not distribute the air evenly, and cold air blows in through broken windows, cracks in the windows, and doors. *Id.* The maintenance men will not fix these issues. *Id.*

When Plaintiff was housed in the East and West cell houses at Menard, he was discriminated against because the administration did not allow these cell houses to go to night yard, and their commissary purchases were subjected to a dollar amount limit. (Doc. 1, p. 31).

Plaintiff has had to sleep on bedframes on several occasions that were bent, dented, filthy, and/or lumpy, which caused him back pain and numbness in his legs and feet. (Doc. 1, p. 32). Plaintiff complained, but his complaints were ignored until his family and friends intervened. *Id.* Then he was retaliated against by being celled with violent inmates. *Id.* When he has been sent to segregation, Plaintiff has been denied hygiene products. (Doc. 1, p. 32-33).

Plaintiff dislocated his pinky finger. (Doc. 1, p. 33). He had to be sent out for an x-ray because there was no doctor or x-ray machine on the grounds. *Id.* The hospital was going to give Plaintiff a metal brace, but Officer Stinson falsely told the doctor that Plaintiff could not have the metal brace at Menard. (Doc. 1, p. 34). Plaintiff was given a plastic brace instead, which did not offer any support, and his finger was taped to a tongue depressor. *Id.* Plaintiff had previously had a similar injury where he severed the pip joint/ligament. *Id.* He asked the doctor whether he had done so this time, but the doctor told him that he would need an MRI to make that determination. (Doc. 1, p. 35). Plaintiff requested an MRI when he got back to Menard, but the nurse told him

that Wexford would not approve an MRI for his injury. *Id*. Plaintiff was never given a follow-up visit, and when he complained about pain and that the tape fell off the splint, he was ignored. *Id*. Plaintiff sent in sick call slips about his finger from January 30 through February 12, 2017. (Doc. 1, p. 36). Plaintiff finally got an x-ray on March 2, 2017, which showed degenerative changes. *Id*. Plaintiff was denied medical care, an MRI, and surgery for his finger by Dr. Trost and Dr. Siddiqi. (Doc. 1, pp. 36, 38). Dr. Caldwell eventually recommended an orthopedic consult, but Plaintiff was denied follow up care, and as a result, he is disfigured and has constant pain in his fingers. (Doc. 1, p. 37). Plaintiff alleges that Wexford has an unwritten policy to not send inmates out for MRIs or other specialized care in an attempt to save money. Specifically, Plaintiff alleges that Dr. Ritz denies 95% of all recommendations for MRIs, orthopedic consults, and other specialized care. (Doc. 1, p. 39). Plaintiff alleges that he told both Butler and Lashbrook about his medical care through grievances and letters, and that he also sent a letter to Rauner, who sent it to Baldwin. (Doc. 1, pp. 39-42).

Plaintiff has been diagnosed with attention deficient disorder ("ADD") (Doc. 1, p. 43). He was treated for the disorder while housed at Stateville Correctional Center around 2006 or 2007. Plaintiff was told at the time that Wexford did not treat ADD because IDOC did not stock the medications used to treat it. *Id.* Plaintiff wrote letters to Shicker, Doe #2, and Hinton explaining that he had been diagnosed with ADD and treated for it in the past. *Id.* They never responded. (Doc. 1, p. 44). Plaintiff also wrote to Dr. Trost and Butler and explained that he was depressed as a result of not receiving treatment for his ADD. (Doc. 1, p. 44). Plaintiff also alleges that the failure to treat his ADD made the other treatment he received for his mental health issues ineffective. *Id.* Plaintiff wrote to Doe #2 again after the death of his daughter to complain that he was depressed and his mental health issues were not being treated. (Doc. 1,

pp. 45-46). Plaintiff alleges that he has caused harm to himself in the past as a result of untreated mental health issues, and he speculates that he is likely to become suicidal if not treated. (Doc. 1, p. 47). Plaintiff also alleges that the refusal to treat him violates his Eighth Amendment rights, as well as the Americans with Disabilities Act. (Doc. 1, p. 48).

Plaintiff also alleges that he has been deprived of adequate dental care. (Doc. 1, p. 49). Specifically, he alleges that Wexford has a policy of deliberately delaying dental care due to understaffing for the purpose of saving money. (Doc. 1, pp. 49-50). Plaintiff suffered from bleeding and painful gums for months before he was finally permitted to see Dr. Asselmeier on March 12, 2016. (Doc. 1, p. 50). Plaintiff had been putting in for a teeth cleaning since 2014. (Doc. 1-1, p. 1). Dr. Asselmeier acknowledged that prisoners did not get cleanings every six months or standard toothbrushes, but he told Plaintiff that it was his fault for being in prison. *Id*. Dr. Asselmeier refused to give Plaintiff anything other than ibuprofen for his gum pain. *Id.* Plaintiff's gums continued to hurt, and he put in dental request slips from August 13, 2016, through June 24, 2017. (Doc 1-1, p. 2). Plaintiff complained to Dr. Siddiqi that dental was not responsive to his needs, but Dr. Siddiqi declined to get involved. *Id*. Plaintiff also complained to Wardens Butler and Lashbrook. (Doc. 1-1, p. 3).

Plaintiff finally saw Dr. Newbold on August 28, 2017. *Id.* He alleges that part of the delay was attributable to Wexford because Wexford, Lashbrook, and Baldwin have a policy of suspending or cancelling medical passes, dental passes, optometry passes, and psych passes during lockdowns. (Doc. 1-1, pp. 3, 26). Newbold diagnosed Plaintiff with a cracked tooth on the right side and an exposed nerve in the front left side of his mouth, but Newbold declined to provide treatment for these issues. *Id*. Newbold ordered x-rays, but they were not taken until September 18, 2017, because of Wexford's policy of cancelling medical passes. (Doc. 1-1, p. 4).

8

Plaintiff was supposed to have a follow-up appointment to discuss the x-ray, but it never happened; when he complained to Dr. Siddiqi that he had not gotten a dental follow-up, Dr. Siddiqi declined to intervene. *Id*. Plaintiff also informed Butler, Lashbrook, Baldwin, and Shicker of his complaints regarding Wexford's provision of health care, but they did nothing. (Doc. 1-1, pp. 4-5).

Plaintiff next alleges that Lang and Williams denied him his high blood pressure medication and blood pressure checks in March 2017 in retaliation for naming them in another lawsuit. (Doc. 1-1, pp. 6, 10, 13-14). Plaintiff notified Dr. Siddiqi that Lang and Williams were withholding his medication, but Dr. Siddiqi told Plaintiff that he believed the nurses over him. (Doc. 1-1, pp. 10-11).

On more than twenty occasions, Plaintiff's blood pressure readings were high, but Dr. Siddiqi, Ritz, and Wexford persisted in a course of treatment that had not worked to lower Plaintiff's blood pressure. (Doc. 1-1, p. 11). An outside consultation with a nephrologist was recommended, but Ritz and Wexford would not let Plaintiff get one. (Doc. 1-1, p. 12). This problem has been ongoing since 2014. *Id.* As a result of his poorly controlled blood pressure, Plaintiff's feet swelled, and he experienced chest pains and had to be given an EKG. (Doc. 1-1, p. 14).

Plaintiff also had a hernia, but he was informed by several nurses and physicians that Wexford would take no action until his hernia became strangulated. (Doc. 1-1, p. 6). Plaintiff informed Dr. Siddiqi, Lang, Williams, and Shicker that he was diagnosed with a hernia that was constantly causing him pain. (Doc. 1-1, pp. 6-7). Plaintiff complained about his hernia at the hypertension clinic to Dr. Trost, Dr. Siddiqi, and other non-defendants, but they all told him that the issue was unrelated to hypertension. (Doc. 1-1, p. 7). Plaintiff claims that the medical

providers acted pursuant to a Wexford policy, and the purpose of the Wexford policy was to save money. (Doc. 1-1, pp. 8-9). Plaintiff also complained to IDOC, Rauner, Baldwin, Shicker, Butler, and Lashbrook about Wexford's cost-cutting policies, but they ignored him. (Doc. 1-1, p. 9).

Plaintiff experienced problems with his eyes. (Doc. 1-1, p. 16). Plaintiff's eyes were frequently watery, crusty, dry, irritated, itchy, and red. *Id.* The eye doctor prescribed Plaintiff eye drops (artificial tears) and some gel ointment around 2010 while at Stateville. (Doc. 1-1, p. 17). The Stateville eye doctor continued in this course of treatment despite the fact that Plaintiff's eyes continued to give him trouble. *Id.*

In May 2014, Plaintiff was transferred to Menard where he explained to the eye doctor his past history and the limited efficacy of the drops and ointment. *Id.* Plaintiff continued to complain about his eyes, but the eye doctor never changed her treatment or sent Plaintiff out to a specialist. (Doc. 1-1, p. 18). Plaintiff alleges that this was the result of a Wexford cost-cutting policy. (Doc. 1-1, pp. 17-19).

Plaintiff saw John Doe #1, who replaced the prior eye doctor at Menard, and gave him his medical history. (Doc. 1-1, p. 19). Plaintiff claims that Doe #1 was unable to effectively examine him because Doe #1 uses a wheelchair. (Doc. 1-1, p. 20). Doe #1 continued Plaintiff on the same ineffective course of treatment that Plaintiff had been on for years. (Doc. 1-1, pp. 20-21). Doe #1 eventually diagnosed Plaintiff with Meibomian Gland Dysfunction and prescribed some antibiotics, but Plaintiff alleges the treatment did not work. (Doc. 1-1, p. 21). Plaintiff's eyesight got blurry. *Id.* He was prescribed new glasses to correct his vision, but Plaintiff refused to sign for the glasses without trying them on first, and the nurses refused to give Plaintiff the glasses if he didn't sign. (Doc. 1-1, pp. 22-23). Doe #1 also prescribed Plaintiff baby shampoo for his eyes,

but the baby shampoo did not work. (Doc. 1-1, p. 23). Plaintiff alleges that Doe #1 acted pursuant to a Wexford cost-cutting policy. Plaintiff complained to Dr. Trost and Dr. Siddiqi that Doe #1 had only prescribed eye drops, eye gel, antibiotics, and glasses. (Doc. 1-1, p. 24). Plaintiff also wrote an emergency grievance to Lashbrook. (Doc. 1-1, p. 25). Plaintiff also wrote to Baldwin, Shicker, and Lashbrook and asked them to personally monitor his medical care for his eyes, but they ignored him. (Doc. 1-1, p. 26).

Plaintiff also suffers from carpal tunnel syndrome, which causes pain and numbness in his hand, wrist, and elbow. (Doc. 1-1, p. 27). The condition also affects his ability to hold and grab items. (Doc. 1-1, p. 28). Plaintiff requested an MRI for his arm, but Dr. Trost and Dr. Siddiqi, along with other non-defendants, told him that Wexford would not pay for an MRI. *Id*. Plaintiff wrote to Lashbrook, Baldwin, and Shicker and asked them to personally monitor his medical care because Wexford was not fulfilling its obligation to provide adequate medical care. (Doc. 1-1, p. 30).

Plaintiff's hand also shook at times, and he was observed by Defendants Williams and Lang, but they refused to let Plaintiff see the doctor. (Doc. 1-1, p. 32). Plaintiff claims Williams and Lang refused to help him in retaliation for past grievances and lawsuits. *Id.* Plaintiff has written to Baldwin, Butler, Lashbrook, Shicker, Godinez, and Rauner about this problem, but they also ignored him. (Doc. 1-1, p. 33).

Plaintiff alleges that Wexford, Rauner, Baldwin, Godinez, Butler, Lashbrook, Shicker, Doe #1, Doe #2, Hinton, Dr. Asselmeier, Newbold, Dr. Trost, and Dr. Siddiqi have intentionally inflicted emotional distress on him in violation of state law by ignoring his requests for medical treatment for his eyesight, carpal tunnel syndrome, dislocated finger, severe high blood pressure,

and hernia, and also by denying him dental care, disability accommodations, and mental health services. (Doc. 1-1, p. 34).

Plaintiff further alleges that Lang and Williams intentionally inflicted emotional distress upon him by refusing to provide him with his prescribed medications for high blood pressure and by refusing to forward his complaints about his carpal tunnel syndrome. (Doc. 1-1, p. 36).

Plaintiff also alleges that Rauner, Godinez, Baldwin, Butler, and Lashbrook deliberately inflicted emotional distress upon him because they subjected him to unconstitutional conditions of confinement. (Doc. 1-1, p. 38).

Plaintiff alleges that he suffers from bilateral knee pain, degenerative disk disease, arthritic shoulders, herniated disks, and acromioclavicular joint pain, and that he has been disabled within the meaning of the law since 2007. (Doc. 1-1, p. 41). While at Stateville, Plaintiff was issued waist chain, low bunk, and low gallery permits to accommodate his disabilities, but when he transferred to Menard, his permits were cancelled pursuant to an unwritten policy created by IDOC staff and Wexford without examination by a medical professional. *Id*. Plaintiff suffers pain as a result of denial of these permits, and he argues that the denial constitutes a violation of the Rehabilitation Act. (Doc. 1-1, pp. 41-43).

Plaintiff also alleges that Defendants Wexford, Godinez, Baldwin, Butler, Lashbrook, Shicker, Hinton, Dr. Siddiqi, John Doe #2 (Menard Mental Health Director) deliberately inflicted emotional distress when they refused to treat his ADD. (Doc. 1-1, 44-45).

Plaintiff also alleges that Defendants Butler, Lashbrook, Godinez, and Baldwin denied him access to the courts when they permitted staff to interfere with the grievance process, making it difficult for Plaintiff to exhaust his administrative remedies. (Doc. 1-1, pp. 45-46).

## Discussion

Based on the allegations of the Complaint, the Court finds it convenient to divide the *pro se* action into 23 counts. The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court.

The following claims will proceed in this action:

**Count 1** – Baldwin, Butler, IDOC, Lashbrook, and Rauner were deliberately indifferent to the overcrowded conditions of confinement at Menard Correctional Center, which caused Plaintiff to be double-celled in a cell designed for one inmate, in violation of the Eighth Amendment;

**Count 2** – Baldwin, Butler, IDOC, Lashbrook, and Rauner were deliberately indifferent to an incident where Plaintiff was celled with a violent inmate due to overcrowding, in violation of the Eighth Amendment;

**Count 3** – Baldwin, Butler, IDOC, Lashbrook, and Rauner subjected Plaintiff to unconstitutional conditions of confinement when they assigned him to cells that lacked ventilation, had black mold, were smeared with blood and feces, had lumpy and painful mattresses and bed frames, were infested with vermin and had "ping-pong" toilets, and deprived him of adequate exercise in violation of the Eighth Amendment;

**Count 4** – Baldwin, Butler, IDOC, Lashbrook, and Rauner had a policy of denying inmates adequate access to the courts, in violation of the First Amendment;

**Count 5** – Baldwin, Butler, IDOC, Lashbrook, and Rauner gave Plaintiff an inadequate clothing allowance, in violation of the Eighth Amendment;

**Count 6** – Baldwin, Butler, IDOC, Lashbrook, and Rauner subjected Plaintiff to a soy diet in violation of the Eighth Amendment;

**Count 7** – Baldwin, Butler, Godinez, and Lashbrook had an inadequate grievance process at Menard Correctional Center in violation of the First Amendment;

**Count 8** – Baldwin, Butler, IDOC, Lashbrook, and Rauner had a policy that inmates could not bring water onto the yard, placing Plaintiff at risk for dehydration, in violation of the Eighth Amendment;

**Count 9** – Baldwin, Butler, IDOC, Lashbrook, and Rauner exposed Plaintiff to poor quality water, in violation of the Eighth Amendment;

**Count 10** – Baldwin, Butler, IDOC, Lashbrook, and Rauner exposed Plaintiff to unsanitary meal trays in violation of the Eighth Amendment;

**Count 11** – Baldwin, Butler, Godinez, Lashbrook, and Rauner intentionally inflicted emotional distress upon Plaintiff in violation of Illinois state law due to their refusal to act to correct the unconstitutional conditions of confinement at Menard;

Plaintiff also has attempted to bring other Counts, but the Court finds that those claims are not transactionally related to the claims at issue in Counts 1-11 pursuant to Federal Rule of Civil Procedure 20. Counts 1-11 raise various claims regarding the conditions of confinement at Menard. In fact, Plaintiff's Complaint structures most of the Counts above as a single claim, premised on the policies and practices of high-level officials. In contrast, Counts 12-13 involve the treatment of Plaintiff's various medical conditions at the hands of medical care providers. The factual inquiries into whether defendants were deliberately indifferent to Plaintiff's multiple and unrelated serious medical needs are completely distinct and separate from the questions raised in Counts 1-11, which ask the Court to inquire into Plaintiff's physical surroundings at Menard. As the factual issues vary greatly between claim groupings, they are not transactionally related.

To avoid prejudicing Plaintiff at this time, and because he may not be willing to pay the additional filing fees for these cases, the Court will dismiss the following claims without prejudice. *See Owens v. Hinsely*, 635 F.3d 950, 952 (7th Cir. 2011); *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1016 (7th Cir. 2000).

**Count 12 –** Baldwin, Butler, Caldwell, Lashbrook, Rauner, Ritz, Siddiqi, Trost, and Wexford were deliberately indifferent to Plaintiff's dislocated pinky finger in violation of the Eighth Amendment;

**Count 13 –** Butler, Doe #2, Hinton, Shicker, Trost, and Wexford were deliberately indifferent to Plaintiff's ADD in violation of the Eighth Amendment;

**Count 14 –** Baldwin, Butler, Doe #2, Hinton, Godinez, Lashbrook, Shicker, Siddiqi, and Wexford intentionally inflicted emotional distress on Plaintiff, in violation of Illinois state law by failing to treat his ADD;

**Count 15 –** Asselmeier, Baldwin, Butler, Lashbrook, Newbold, Shicker, Siddiqi, and Wexford were deliberately indifferent to Plaintiff's dental needs in violation of the Eighth Amendment;

**Count 16–** Lang, Williams, and Siddiqui withheld Plaintiff's blood pressure medication in retaliation for his grievance and lawsuit activity in violation of the First Amendment;

**Count 17 –** Ritz, Siddiqi, and Wexford were deliberately indifferent to Plaintiff's blood pressure when they continued a course of treatment they knew was ineffective in violation of the Eighth Amendment;

**Count 18 –** Siddiqi and Wexford were deliberately indifferent to Plaintiff's hernia when they refused to provide anything other than conservative treatment in violation of the Eighth Amendment;

**Count 19 –** Baldwin, Doe #1, Lashbrook, Shicker, Siddiqi, Trost, and Wexford were deliberately indifferent to Plaintiff's eye condition in violation of the Eighth Amendment;

**Count 20 –** Baldwin, Butler, Godinez, Lashbrook, Lang, Rauner, Shicker, Siddiqi, Trost, Wexford, and Williams were deliberately indifferent to Plaintiff's carpal tunnel syndrome in violation of the Eighth Amendment;

**Count 21 –** Asselmeier, Doe #1, Doe #2, Hinton, Newbold, Rauner, Siddiqi, Trost, and Wexford intentionally inflicted emotional distress when they created a health care system that left Plaintiff's eyesight, carpal tunnel syndrome, dislocated finger, blood pressure, hernia, teeth, and mental health inadequately treated and his disabilities inadequately accommodated in violation of Illinois state law;

**Count 22 –** Lang and Williams intentionally inflicted emotional distress upon Plaintiff when they withheld his medication for his blood pressure and refused to treat his carpal tunnel syndrome in violation of Illinois state law; and

**Count 23 –** IDOC and Wexford refused to develop policies to accommodate Plaintiff's disabilities in violation of the Rehabilitation Act.

Plaintiff may file other lawsuits if he wishes to pursue these claims, but he is warned that his many medical claims are likely also transactionally unrelated to each other and that <u>if he attempts to bring those claims in a single lawsuit again, those claims could be subjected to severance and the imposition of further filing fees</u>.

### Disposition

**IT IS HEREBY ORDERED** that Counts 12-23, which are transactionally unrelated to Counts 1-11, are **DISMISSED without prejudice** as improperly joined. Defendants Trost, Siddiqi, Asselemeier, Newbold, Ritz, Wexford, Williams, Lang, Stinson, Shicker, Hinton, Doe #1, Doe #2, and Godinez are **DISMISSED without prejudice**. Plaintiff may bring those claims in new, separate cases if he so desires. Counts 1-11 shall proceed in this case.

**DATED:** April 6, 2018

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**